```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

UNITED STATES OF AMERICA,    )
                             )   CRIMINAL ACTION NO.
v.                           )   10-10300-DPW
                             )
TARLEE TEAH,                 )
                             )
            Defendant.       )
                             )

<br>

<u>MEMORANDUM</u>
August 20, 2012

Tarlee Teah, the defendant in this drug prosecution, moved (Dkt. No. 26) to exclude from evidence all items seized during a search of a vehicle he was using on August 17, 2010. This Memorandum provides a full statement of the reason supporting my electronic order entered January 25, 2012 denying that motion.

## I.  FINDINGS OF FACT

Following a full evidentiary hearing and consideration of the submissions of the parties, I make the following findings.[1]

At approximately 4:30 p.m. on August 17, 2010, Detective Gary Hagerty of the Lynn Police Department was driving an unmarked cruiser in the Highlands area of Lynn, Massachusetts. Detective Hagerty had a sound basis for believing the Highlands

---

[1] As will be apparent from these findings of fact, I largely credit the testimony of Detective Hagerty with respect to the facts relevant and material to the Fourth Amendment determinations made below. Teah collaterally attacked Detective Hagerty's credibility, but that attack did not significantly affect my choice to credit his testimony with respect to this motion.

area to be a high-crime neighborhood.  While on patrol in the area, Detective Hagerty pulled up behind a Nissan Pathfinder that was stopped in the middle of Lawton Avenue dropping a passenger off.  Detective Hagerty recognized the Pathfinder from his time working with a FBI task force investigating gang-related drug operations on the North Shore.

Detective Hagerty used a laptop in his car to run the Pathfinder's plates.  The computer informed him that the Pathfinder's registration had expired, so he turned on his lights and siren and pulled the Pathfinder over.  As he approached the driver's side window, Detective Hagerty saw the driver move forward in his seat, as if to place something underneath it.  When he got to the window, Detective Hagerty recognized the driver as Tarlee Teah, who he knew had prior drug charges in Lynn and had a pending case for a charge of assault to kill stemming from a shooting.  That morning Detective Hagerty had attended a FBI Task Force meeting at which Teah was named as the suspected crack cocaine supplier to a number of targets in an ongoing investigation code-named "Melting Pot."

Detective Hagerty asked Teah for his license and registration.  As Teah reached over to his glove compartment for his registration, Detective Hagerty noticed that the left pocket of Teah's shorts contained a substantial sum of money, and that his right pocket displayed a large bulge.  Teah produced his

license and registration, and Detective Hagerty noted that the registration had expired. He also observed that Teah appeared extremely nervous: Teah's hands were shaking as he handed over his license and registration, his voice trembled when answering Detective Hagerty's questions, and his heartbeat was visible through his t-shirt. Detective Hagerty took Teah's documents and returned to his squad car to write a ticket.

A few minutes later, Detective Hagerty approached Teah at the driver's side window to reconfirm Teah's address and inform him that he was going to have the car towed for the expired registration infraction. Upon returning to his squad car, Detective Hagerty called for backup because he was going to remove Teah from the Pathfinder so the vehicle could be towed. Five officers arrived a few minutes later.

When backup arrived, Detective Hagerty began telling the officers what had happened and his observations thus far. As he was doing so, Officer Guillermo observed Teah moving around in the Pathfinder. The officers then removed Teah from the driver's compartment, and pat-frisked him. The driver's side door remained open while Teah was being patted down, and from outside the car Officer Wonoski observed a silver object underneath the front seat, which he recognized to be the slide aperture of a handgun.

Teah was handcuffed and read his *Miranda* warnings. The officer who read him his *Miranda* warnings then asked if Teah had a license to carry the gun found under the seat, and Teah responded that he did not. At approximately the same time, Officer Guillermo spotted a purple Crown Royal bag on the floor of the back seat in the area in which Officer Guillermo had seen Teah moving before he was asked to exit the vehicle. Officer Guillermo noticed that the bag appeared full, and discovered that it contained 209.3 grams of cocaine base and 124.7 grams of cocaine. After a photographer was called to capture the location of a Smith & Wesson .40 caliber handgun under the front seat and the drugs in the rear, officers towed the vehicle away.

## II. DISCUSSION

A. Legal Principles

The Fourth Amendment prohibits searches and seizures that are unreasonable. *Terry* v. *Ohio*, 392 U.S. 1, 9 (1968). In the absence of an applicable exception to the warrant requirement, searches undertaken without a valid warrant supported by probable cause are presumed to be unreasonable. *United States* v. *McGregor*, 650 F.3d 813, 820 (1st Cir. 2011).

An officer may stop a vehicle if he witnesses the driver commit a traffic offense. *Id.* ("An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else."). Once a valid stop

4

has been made, an officer may "then order the occupants out of the auto," *id.* (citing *Maryland* v. *Wilson*, 519 U.S. 408, 410 (1997), and may perform a pat-frisk of the occupants if, under the totality of the circumstances, the officer has a particularized objective basis to suspect that the occupants may be dangerous and have weapons within their ready reach (including within the vehicle itself). *Id.* (citing *Michigan* v. *Long*, 463 U.S. 1032, 1037 (1983)).

B.  Analysis

Here, there is no dispute that Detective Hagerty witnessed Teah commit a traffic offense.  Consequently, the inquiry turns on whether under the totality of the circumstances Detective Hagerty had reasonable suspicion that Teah was dangerous and that a weapon was easily accessible to him in the vehicle.

The record contains ample evidence to support Detective Hagerty's reasonable suspicion that Teah was armed and dangerous. Detective Hagerty stopped Teah in a high-crime area, and Teah had prior drug and firearm charges.  Teah was, at the time, awaiting trial on an assault to kill charge stemming from an attempted shooting of a woman.  Detective Hagerty also knew that Teah was a person identified as of interest in a FBI Task Force investigation and was suspected to be a crack cocaine supplier to

a number of other gang members targeted in the investigation.[2] Detective Hagerty had personal knowledge of all of these facts from his interactions with Teah in the past, and his own involvement with the FBI Task Force.

Detective Hagerty also observed a number of Teah's actions during the stop that support a finding of reasonable suspicion. Teah was visibly nervous; his hands and voice were shaking, and Detective Hagerty observed that Teah's heart was pounding. When he first approached Teah, Detective Hagerty noticed a large, unexplained bulge in Teah's right pocket.[3] And Detective Hagerty and Officer Guillermo each witnessed Teah moving around in the vehicle before they ordered him out and performed the pat-frisk.

*United States* v. *McKoy*, relied on by Teah, is inapposite. There, fruits of the officers' pat-frisk were suppressed because the pat-frisk was based solely on the driver's nervousness and location in a high-crime area. 428 F.3d 38, 40 (1st Cir. 2005). Here, Detective Hagerty had more substantial reason to believe Teah was dangerous. Not only was he stopped in a high-crime neighborhood and acting in a fashion more nervous than Detective Hagerty could remember any other driver to whom he had given a

---

[2] The First Circuit has repeatedly recognized that guns have become "tools of the trade" in the illicit drug business. *See, e.g., United States* v. *Cresta*, 825 F.2d 538, 554 (1st Cir. 1987).

[3] The record does not disclose what, if anything, was located in Teah's right pocket.

ticket in his career acting, Teah was suspected of drug trafficking by law enforcement involved in a joint investigation; had a number of arrests involving guns (including a pending trial for a shooting); had a large unexplained bulge in his right pocket; and was twice observed moving around in the vehicle after he was stopped, once in a manner consistent with placing something underneath the front seat of the vehicle.

Once officers removed Teah from the Pathfinder and began their pat-frisk, Officer Winowski saw a gun in plain view under the driver's seat. Teah was placed in handcuffs for the officers' safety, and admitted that he did not have a license for the firearm. As Teah was being placed in handcuffs, Officer Guillermo noticed a purple Crown Royal bag on the floor of the rear seats of the Pathfinder. The bag appeared full, and was located in the approximate area Officer Guillermo had witnessed Teah moving towards while he was still inside the vehicle. Upon opening the bag, Officer Guillermo discovered the crack cocaine and powder cocaine that was subsequently seized.

That Teah was placed in handcuffs for officers' safety moments before admitting that he did not have a license for the gun and before drugs were found on the rear floor of the vehicle does not undermine the availability of *Terry* doctrine to justify Teah's restraint in this setting. The officers here were not required to leave unsecured a person they had reasonable

suspicion was armed and dangerous merely because they did not know whether Teah had a license to carry the gun found within arm's reach under the front seat.  Instead, the officers acted prudently in handcuffing Teah for everyone's safety while continuing the investigation.  *See, e.g.*, *Terry*, 392 U.S. at 30 (noting that officers are entitled "to take swift measures to discover the true facts and neutralize[] the threat of harm if it materialize[s]").

Teah argues that he was arrested without probable cause, so his statement admitting that he did not have a license for the gun should be suppressed.  Although he does not focus on it,[4] Teah's most promising argument is that the latest he was arrested was when he was placed in handcuffs because officers did not have probable cause to arrest him at that time since they did not yet know whether Teah had a license for the gun and no drugs had been found.

However, "when officer safety is a legitimate concern, a *Terry* stop appropriately may involve the application of handcuffs" without converting the stop into a de facto arrest. *United States* v. *Pontoo*, 666 F.3d 20, 31 (1st Cir. 2011); *see United States* v. *Fornia-Castillo*, 408 F.3d 52, 64 (1st Cir. 2005) ("[N]either the use of handcuffs nor the drawing of a weapon

---

[4]  Teah primarily argues that he was arrested the moment officers asked him to leave his vehicle.

necessarily transforms a valid *Terry* stop into a de facto arrest."). Indeed, "[w]here an investigatory stop is justified at its inception, it will generally not morph into a de facto arrest as long as 'the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop.'" *United States* v. *Chaney*, 647 F.3d 401, 409 (1st Cir. 2011) (citation omitted).

To show that the use of handcuffs in a *Terry* stop does not exceed *Terry*'s limits and convert the stop into a de facto arrest, officers "must be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm." *United States* v. *Acosta-Colon*, 157 F.3d 9, 18-19 (1st Cir. 1998) (emphasis omitted). That showing has been made here.

In *Chaney* the First Circuit held that the use of handcuffs and drawn weapons did not convert a *Terry* stop into a de facto arrest. 647 F.3d at 408. There, United States Marshals raided a motel room in order to execute an arrest warrant for a suspected crack cocaine dealer named Peter Boyd. The motel room was registered to Brigit Hebert, who Marshals knew had been arrested

9

for drug-related crimes in the past.  Unbeknownst to the Marshals, however, a third party, an acquaintance of Boyd's named Vincent Chaney, was present in the motel room.  Marshals knocked on the motel room door, announced their presence, and arrested Boyd when he answered the door.  They then entered the motel room with guns drawn to perform a protective sweep.  *Id.* at 403.  They discovered Hebert in bed and Chaney standing by the edge of the bed.  When ordered out of bed, Hebert complied.  Chaney was ordered to stop moving and get on the ground, but was not compliant despite repeated commands.  Eventually, Chaney complied and was handcuffed while the Marshals completed their sweep of the motel room, which turned up drugs and ammunition in plain view.  *Id.*  Additional drugs were found in Chaney's pockets.  Chaney sought to suppress the evidence Marshals found on his person after he was handcuffed.  *Id.* at 404-05.

The First Circuit agreed with the district court that the use of handcuffs and drawn weapons did not transform the Marshals' investigatory stop of Chaney into a de facto arrest.  *Id.* at 408.  The First Circuit began by identifying the general test for distinguishing between temporary detentions and de facto arrests: "we inquire, in light of the totality of the circumstances, whether a reasonable person in the suspect's position would have understood [his] position 'to be tantamount to being under arrest.'"  *Id.* at 409 (quoting *United States* v.

*Zapata*, 18 F.3d 971, 975 (1st Cir. 1994)). Noting that neither the use of handcuffs nor drawn guns is determinative of the question, *id.* (citing *Fornia-Castillo*, 408 F.3d at 64), the First Circuit found:

> no error in the district court's finding that the specific circumstances of the November 30, 2005 raid gave rise to a reasonable concern for officer security that justified the use of handcuffs and drawn handguns. The unanticipated presence, in a darkened motel room inhabited by two suspected drug dealers, of an unfamiliar man who ignored repeated orders from the police to stop moving and drop to the ground might alone be enough to justify more intrusive measure for briefly securing him during an investigative stop.

*Id.* at 409.

The First Circuit cited the Ninth Circuit's decision in *United States* v. *Taylor*, 716 F.2d 701 (9th Cir. 1983), for support. There, officers had been warned that the driver of a truck was dangerous, and were told that others with him should be considered dangerous as well. *Id.* at 708. Officers approached the passenger in the truck with guns drawn and ordered him to raise his hands. He refused to do so, and instead "made furtive movements with his hands inside the vehicle." *Id.* Only after officers gave two more orders did the passenger comply and raise his hands. He was removed from the truck and handcuffed. *Id.* The Ninth Circuit held that the passenger had not been de facto arrested and the use of handcuffs and the frisking of his person for weapons were justified for officers' safety. *Id.* at 709.

11

*As in Chaney* and *Taylor*, the law enforcement officers here were justified in handcuffing Teah for their safety when they discovered a gun underneath his front seat. As noted above, the pat-frisk of Teah was justified by legitimate concerns for officers' safety. Upon discovering the handgun and thus verifying the safety concern which justified the pat-frisk in the first place, the officers made a split second judgment to place Teah in handcuffs to protect themselves. Such a move was "reasonably responsive" to the developing circumstances the officers faced, and "necessary to carry out the legitimate purposes of the stop without exposing" officers to an undue risk of harm. Therefore, the officers' use of handcuffs did not convert their otherwise proper *Terry* stop and frisk into an improper de facto arrest. *See Chaney*, 647 F.3d at 409; *Taylor*, 716 F.2d at 709.

Nor do the other aspects of Teah's detention support a finding of a de facto arrest. The duration of the stop was short, lasting roughly ten minutes. *See, e.g.*, *United States* v. *Owens*, 167 F.3d 739, 749 (1st Cir. 1999) (finding a fifty minute detention was not a de facto arrest). Approximately six officers were involved, but they neither voiced threats nor brandished their weapons, and their approach was measured and polite. *See, e.g., Zapata*, 18 F.3d at 975 (finding no de facto arrest in an incident involving five officers displaying these

characteristics). The encounter took place in public. *Id.* (finding the public setting of the encounter to weigh in favor of a finding that it was not a de facto arrest). They did read him his *Miranda* rights. However, while often a sign a person has been taken under arrest, a *Miranda* recital independently has valuable warnings for a *Terry* detainee as well.

Weighing the totality of these circumstances and the officers' safety rationale for placing Teah in handcuffs, I cannot find that a reasonable person would consider his position to be tantamount to being under arrest. *See id.* The officers' actions therefore did not transform the lawful *Terry* stop into a de facto arrest. As a consequence, Teah's statement that he did not have a license for the firearm, and Officer Guillermo's discovery of the drugs on the rear floor of the vehicle, need not be suppressed as products of an arrest without probable cause.[5]

---

[5] Even if Teah had been placed under arrest at the time he was put in handcuffs, suppression would not be warranted because discovery of the drugs in the back of the car and the fact that Teah did not have a license for the gun, was inevitable. An unregistered vehicle may not be driven on public roads in Massachusetts. *See* Mass. Gen. Laws ch. 90 § 9 ("No person shall operate . . . any motor vehicle . . . unless such vehicle is registered in accordance with this chapter . . . ."). Detective Hagerty had already told Teah he was going to tow Teah's car, and although the relevant inventory-search procedures were not produced during the evidentiary hearing (because they were not challenged at all by Teah), the Supreme Court "has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976). For its part, the First Circuit has found that where "[t]he record establishes

13

### III. CONCLUSION

For the reasons set forth above, I have denied Teah's motion to suppress (Dkt. No. 26).

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

unequivocally that the car containing the contraband was unregistered" and thus "could not lawfully be driven on a public highway . . . the state police surely would have impounded it and, in accordance with standard practice, conducted a routine inventory search." *United States* v. *Zapata*, 18 F.3d 971, 979 (1st Cir. 1994). So too, here.